IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          )
                                  )
        v.                        )    Criminal No. 21-385
                                  )
JOSHUA YARBOUGH                   )

**MEMORANDUM OPINION**

Presently before the Court is Defendant Joshua Yarbough's Motion to Suppress Pre-trial

Identification.  (Docket No. 1679).  After careful consideration of Defendant's Motion, the parties'

written submissions, the transcript of the suppression hearing and the credible evidence of record

adduced at that proceeding, the Motion will be denied for the reasons explained below.

I.      **BACKGROUND**

        A.  **Procedural History**

On August 31, 2021, Defendant and 23 others were charged in Count One of the Indictment

in this case with conspiracy to possess with intent to distribute and distribute 400 grams or more

of fentanyl, 280 grams or more of crack cocaine, a quantity of cocaine, a quantity of heroin, and a

quantity of fluorofentanyl, in violation of 21 U.S.C. § 846, for conduct occurring from in and

around August 2019 and continuing until in and around August 2021.  (Docket No. 3 at 1-2).

Defendant also is charged with six counts of possession with intent to distribute and/or distribution

of a quantity of fentanyl and/or a quantity of crack cocaine for conduct occurring on or about the

following dates: April 26, 2021 (Count Two); April 30, 2021 (Count Three); May 25, 2021 (Count

Four); May 30, 2021 (Count Five); and June 18, 2021 (Counts Eight and Nine), each in violation

of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  (*Id.* at 3-6, 10-11).  Additionally, Defendant is

charged with using, carrying and discharging a firearm during and in relation to a drug trafficking

1

crime, and possession of a firearm in furtherance thereof, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), for conduct occurring on or about June 13, 2021 (Count Six), as well as possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), for conduct occurring on or about June 18, 2021 (Count Seven).  (*Id.* at 7-9).

Defendant now seeks to suppress Detective Vo's pretrial identification of him because he claims that the identification procedure was so suggestive that it violated his due process rights. (Docket No. 1679, ¶ 20).  In summary, Defendant asserts that Detective Vo only was shown a single photograph which was derived from video surveillance footage captured prior to the shooting in question, and there is no explanation regarding how Detective Vo knew Defendant. (*Id.*, ¶¶ 22, 23).  Defendant argues that using a single photograph was unconstitutionally suggestive and therefore warrants suppression of Detective Vo's identification of him.  (*Id.*, ¶ 24).  The Government responds that Defendant's Motion to Suppress should be denied because the challenged identification was neither unnecessarily suggestive nor unreliable.  (Docket No. 1717 at 27-29).

The Court held a hearing on Defendant's Motion to Suppress, the official transcript of which was filed of record.  (Docket Nos. 1805, 1813).  At the Court's direction, the parties submitted post-hearing proposed findings of fact and conclusions of law ("FOF/COL").  (Docket Nos. 1840, 1841).  The Government then filed a response to Defendant's FOF/COL, (Docket No. 1850), but Defendant did not similarly respond.  All post-hearing submissions are complete, and the matter is now ripe for disposition.

**B.  Facts**

At the hearing on Defendant's Motion to Suppress, the Government presented testimony by Detectives Quoc Vo and Shawn Bliss.  The Government also entered the following exhibits

into evidence: line sheets of calls and text messages from two cellular telephones associated with Defendant that were captured on a wiretap; audio of telephone call - session 5468; audio of telephone call - session 5472; audio of telephone call – session 6457; video from camera located at corner near Go Go's Market on 6/13/21; video from camera located outside of Go Go's Market on 6/13/21; video depicting entrance to Go Go's Market through front door on 6/13/21; video from interior camera of Go Go's Market on 6/13/21; video from camera on exterior of school near scene of shooting on 6/13/21; video from city camera located at East Elizabeth Street and Ashton Avenue in Hazelwood on 6/13/21; map of Hazelwood area; text message dated 6/16/21 from Detective Bliss to Detective Vo containing image from video inside of Go Go's Market; and still photograph of an image from video inside of Go Go's Market (from Detective Bliss' text message dated 6/16/21 to Detective Vo).  (*See* Docket No. 1805-1, Govt. Exs. A-M).

Before summarizing the testimonial evidence, the Court initially notes that it evaluates the credibility of the witnesses who testified at the hearing consistent with certain well-established principles.  Broadly stated, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).  More specifically, as finder of fact, the Court "is free to accept or reject any or all of a witness's testimony." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted).  To that end, "[c]redibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony

3

in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic." *Id.* Relevant here, a witness' testimony is not to be judged more or less credible because the witness is a law enforcement officer. *Id.* at 569-70 (citations omitted).

Considering the witnesses' demeanor and testimony in response to the questioning of the attorneys at the suppression hearing, as well as the other salient factors just discussed, the Court finds that they each offered credible testimony concerning their recollection of the events that unfolded which bear on the matter at issue, despite opposing counsel's respective efforts to impeach them. *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) ("[W]hen findings are based on determinations regarding the credibility of witnesses . . . for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.") (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 575 (1985)). Accordingly, the Court now turns to the testimony adduced at the suppression hearing, which is fairly summarized as follows.

The Court first observes that Detectives Vo and Bliss each presented as an experienced law enforcement officer. At the time of the hearing, Detective Vo had been employed for three years as a detective with the Allegheny County Police in the narcotics unit's violent crimes and firearms group. (Docket No. 1813 at 10). Prior to that, Detective Vo was employed for six years with the City of Pittsburgh Police working in Zone 4, which covers the neighborhoods of Squirrel Hill, Hazelwood, Greenfield, and surrounding areas. (*Id.*). While working in Zone 4, Detective Vo was assigned to violence prevention and intelligence, investigating criminal activity in the Zone 4 area. (*Id.* at 11). Detective Bliss has been employed with the City of Pittsburgh Police since 2015. (*Id.* at 52). He was a patrol officer for a number of years, then he worked in Group Violence

Intervention, and he now works in homicide. (*Id.*). Detective Bliss did some work in Zone 4 in connection with his work with Group Violence Intervention. (*Id.* at 52-53).

Through Detective Vo's work in Zone 4, he was familiar with the Hazelwood Mob, who were a group of individuals in Hazelwood involved in narcotics distribution, illegal firearm possession, and violence, according to Detective Vo's testimony. (Docket No. 1813 at 11). In 2021, Detective Vo learned that the FBI was investigating the Hazelwood Mob, and the wiretap phase of the FBI's investigation began in April 2021. (*Id.* at 11-12). Detective Vo was involved in the investigation, and he provided intelligence to the FBI regarding individuals in the Hazelwood area and assisted the FBI with surveillance of certain individuals. (*Id.* at 12). Detective Vo worked full time on the investigation five days per week, and he also worked wire shifts on weekends or other times outside of his regular work hours. (*Id.* at 12-13). During a wire shift, Detective Vo worked in the wire room at the FBI, where he monitored in real-time the telephone calls and text messages which were intercepted pursuant to the authorized wiretap and drafted synopses of the communications. (*Id.* at 12). All told, Detective Vo worked six or seven days a week on this case. (*Id.* at 13).

Detective Vo testified that Defendant was one of the targets of the investigation. (Docket No. 1813 at 13). While conducting surveillance in early 2021, Detective Vo noticed that Defendant (who he did not know at the time) frequently was present in Hazelwood. (*Id.*). As Detective Vo explained, at that point in early 2021, one of the investigation's main goals was to identify Defendant. (*Id.*). After Defendant appeared and was identified, Detective Vo saw him almost every day on the street and also was involved in surveilling him. (*Id.* at 13-14). In addition to viewing Defendant in person, Detective Vo saw photos of Defendant and reviewed videos of him captured on FBI and City of Pittsburgh cameras placed in Hazelwood. (*Id.* at 13-15). Detective

5

Vo testified that he was very familiar with Defendant's appearance and described that he wore his hair in long dreads throughout the time period of the investigation. (*Id.* at 15). In May 2021, the FBI began intercepting Defendant's telephones, therefore Detective Vo also was very familiar with Defendant's voice from listening to calls on his wiretap shifts. (*Id.* at 13, 22).

Detective Vo additionally learned the types of cars Defendant drove, including a white Nissan Maxima and a dark blue or black Dodge Journey, which was registered to his mother. (Docket No. 1813 at 15). In the spring of 2021, Detective Vo saw Defendant driving the Dodge Journey whenever he was not driving the Nissan, which was about every other day. (*Id.* at 15-16).

At approximately 2:40 p.m. on June 13, 2021, there was a shooting in Hazelwood. (Docket No. 1813 at 16, 21). The victim was R.H. (*Id.* at 16). Detective Vo was off that day, but he received a shots fired notification on his phone and subsequently spoke to FBI agents and Zone 4 patrol officers about the shooting. (*Id.*). Detective Vo learned that the male who was shot was at the hospital, and there was video of a suspected shooter. (*Id.*).

Detective Vo began investigating the shooting when he went to work on June 14, 2021. (Docket No. 1813 at 16-17). He reviewed video from the city cameras, canvassed the area for additional video footage, went to the scene to look for casings that may have been missed, and spoke to other detectives in homicide and at headquarters. (*Id.* at 17). From his review of certain videos, Detective Vo determined that the shooter drove the Dodge Journey vehicle which he observed Defendant regularly driving. (*Id.*). Detective Vo tracked the Dodge Journey on the cameras that were available in the Hazelwood neighborhood and noticed that the vehicle had stopped at the Go Go's market in Hazelwood earlier that day. (*Id.* at 17-18). Detective Vo then went to Go Go's to retrieve the video. (*Id.* at 18). After reviewing the Go Go's video, Detective Vo confirmed that Defendant had been in the store on June 13, 2021, the day of the shooting. (*Id.*).

6

As noted at the outset, the Government admitted into evidence at the suppression hearing several of the videos obtained and reviewed by Detective Vo, as well as line sheets of calls and text messages from two cellular telephones associated with Defendant that were intercepted on the wiretap and the audio of certain telephone calls.  (*See* Docket No. 1805-1; Govt. Exs. A - J). Detective Vo testified about the substance of the videos, line sheets, calls, and texts.  (*See* Docket No. 1813 at 18-34).  In summary, after reviewing the audio and video evidence, Detective Vo identified Defendant as the shooter in the shooting incident that occurred in Hazelwood on June 13, 2021.[1]  (*Id.* at 23, 25).  As Detective Vo testified, he identified Defendant based on "his stature, his hair style, the clothing that he was wearing earlier in the day, and the car that he was driving." (*Id.* at 33).  Even though Defendant's face was obscured in some of the videos, Detective Vo was "100 percent" confident in his identification of Defendant because he regularly saw Defendant. (*Id.* at 41, 42, 50).  Additionally, while conducting surveillance in the summer prior to the shooting incident, Detective Vo saw Defendant pistol-whip an individual outside of Go Go's market, which firmly engrained Defendant's appearance in Detective Vo's mind.  (*Id.* at 50-51).

Based on the audio and video evidence, there was enough evidence to swear out an arrest warrant for Defendant by June 16, 2021.  (Docket No. 1813 at 36).  Detective Bliss authored the affidavit in support of the arrest warrant.  (*Id.* at 36-37).  Detective Vo testified that Government's Exhibits L and M were a June 16th text message from Detective Bliss containing  a still photograph of Defendant taken from video inside of Go Go's Market.  (*Id.* at 37, 38).  By the time Detective Vo received Detective Bliss' text message, he had watched the surveillance video from Go Go's, along with all of the other video evidence, and he had reviewed Defendant's calls and text

---

1    The Government explained that the shooting which occurred on June 13, 2021 is the basis for Count Six of the Indictment charging Defendant with using, carrying and discharging a firearm during and in relation to a drug trafficking crime, and possession of a firearm in furtherance thereof, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  (*See* Docket No. 1717 at 22).

messages. (*Id.* at 37, 50). In light of that review, Detective Vo already had identified Defendant as the shooter before he received Detective Bliss' text message containing the photograph of him. (*Id.* at 46). Detective Vo's testimony confirmed that he identified Defendant as the shooter based on the totality of the evidence uncovered in the investigation and his familiarity with Defendant from having seen him almost daily. (*Id.* at 38, 51).

Detective Bliss testified that he submitted the affidavit of probable cause in support of the arrest warrant for Defendant on June 16, 2021. (Docket No. 1813 at 53). Prior to submitting the affidavit, Detective Bliss sent Detective Vo a text message with a photograph of Defendant as confirmation for his own records. (*Id.* at 53-54). Detective Bliss verified that photograph was admitted in evidence at the suppression hearing as Government Exhibits L and M. (*Id.* at 53). Detective Bliss testified that Detective Vo already had identified Defendant as the shooter prior to the time he texted Detective Vo the photograph of Defendant. (*Id.* at 54).

Detective Bliss explained that his affidavit of probable cause in support of the arrest warrant for Defendant did not include all the reasons for Detective Vo's identification of Defendant. (Docket No. 1813 at 54). According to both Detective Bliss and Detective Vo, reference to the wiretap was omitted from the affidavit for a strategic reason. (*Id.* at 38-39, 54). As Detective Vo explained, the purpose of the omission was to "keep the wiretap intact, to not expose it so that we could continue our investigation and be effective," because the FBI had other targets they were hoping to investigate at the time. (*Id.* at 38-39).

It the Court's estimation, the foregoing fairly summarizes the witnesses' testimony adduced and the evidence admitted at the suppression hearing. With this background, the Court turns to analyze Defendant's suppression claim.

II.      **MOTION TO SUPPRESS PRE-TRIAL INDENTIFICATION**

Defendant advocates that Detective Vo's pretrial identification of him should be suppressed because the identification procedure was so suggestive that it violated his due process rights. (Docket No. 1679, ¶ 20). As set forth in Defendant's post-hearing FOF/COL, sending a text message with a single photograph of one individual to Detective Vo, as Detective Bliss did here, was meant to be unduly suggestive because Detective Vo already had made up his mind that Defendant was the shooter prior to receiving the text with the photograph. (Docket No. 1840, ¶¶ 151, 152). Additionally, despite conceding that "Detective Vo was familiar with [him]" through in-person observations and review of multiple surveillance videos, including the one from which the still photograph was extracted, (*see id.*, ¶¶ 148, 150), Defendant maintains that "no reasonable person could determine who was in the surveillance video from the shooting or from the Go Go's" because the person's face was obscured, and no facial features could be discerned. (*Id.*, ¶¶ 149, 150).

The Government counters in its Response to Defendant's proposed FOF/COL that any reasonable person armed with the same facts as Detective Vo could identify Defendant in the video footage, particularly given that Detective Vo is not an ordinary citizen but rather a trained law enforcement officer who is expected to pay scrupulous attention to detail. (Docket No. 1850 at 4). As for Defendant's assertion that the text message containing Defendant's photograph was unduly suggestive, the Government highlights that the focus is whether the identification procedure as a whole is unduly suggestive, not just one small part of it. (*Id.*). On that score, the Government reiterates that Detective Vo did far more than look at one photograph to identify Defendant, and he explained at the hearing all the ways in which he identified Defendant. (*Id.* at 4-5). The Government is correct that there is no basis to suppress Detective Vo's identification of Defendant.

A.       **Legal Standard**

The Supreme Court has emphasized that an individual's "most basic right as a criminal defendant [is] his right to a fair trial at which the witnesses against him might be meaningfully cross-examined." *United States v. Wade*, 388 U.S. 218, 224 (1967).  The *Wade* Court recognized that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *Id.* at 228.  Consequently, "[a]n identification procedure that is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification violates due process." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977)).  The first inquiry "contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." *Id.* (quoting *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991)).  A defendant seeking to exclude identification evidence bears the burden to prove that the identification procedure was impermissibly suggestive. *United States v. Lynch*, 214 F. App'x 248, 252 (3d Cir. 2007).

Even if a defendant sustains that burden, "unnecessary suggestiveness alone does not require the exclusion of evidence." *Brownlee*, 454 F.3d at 138-39 (citation omitted).  Ultimately, "reliability is the linchpin in determining the admissibility of identification testimony." *Brathwaite*, 432 U.S. at 114; *United States v. Hall*, 28 F.4th 445, 454 (3d Cir. 2022) ("[D]ue process requires the suppression of an identification only if it was obtained pursuant to a suggestive process that in turn raises serious questions about the reliability of the resulting identification.").  In evaluating whether the identification was reliable under the totality of the circumstances, courts consider the following factors: the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the

criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). Where evidence is found to be reliable, even if unnecessarily suggestive, "any weaknesses [in the evidence] go to weight rather than admissibility." *United States v. Scott*, 816 F. App'x 732, 739 (3d Cir. 2020).

### B. There is No Basis to Suppress Detective Vo's Identification of Defendant

Detective Vo's identification of Defendant does not violate due process because the procedure at issue was neither unnecessarily suggestive nor unreliable. First, despite Defendant's contention that sending a single photograph of one individual to Detective Vo was intended to be impermissibly suggestive,[2] (*see* Docket No. 1840, ¶ 152), he has not sustained his burden to establish suggestiveness.

As Defendant concedes, Detective Vo was familiar with him from seeing him in person and surveilling him in Hazelwood, from reviewing videos of him captured on FBI and city cameras placed in Hazelwood, and from listening to his telephone calls and reading his texts captured on the wiretap. (Docket. Nos. 1813 at 13-15, 22; 1840, ¶¶ 148, 150). Consequently, Defendant's appearance, how he wore his hair, how his voice sounded, and the kind of cars he drove, including a dark colored Dodge Journey, all were well known to Detective Vo. As Detective Vo credibly testified, he ultimately identified Defendant as the shooter in the shooting that occurred on June 13, 2021, based on the totality of the evidence uncovered in the investigation and his familiarity with Defendant from having seen him almost daily. Detective Vo also credibly testified that he

---

[2] The Third Circuit Court of Appeals has recognized that "[a]n impermissibly suggestive identification procedure can occur in four settings: a show-up, a photo array, a line-up and in court." *Brownlee*, 454 F.3d at 137. "Show-up" procedures, where a single individual fitting the perpetrator's description is presented to the witness for identification, are "inherently suggestive" because "by [their] very nature," they imply that "the police think they have caught the perpetrator of the crime." *Id.* at 138 (citation omitted). However, such procedures are not always unnecessarily suggestive. Even if the identification at issue here could be construed as involving a "show-up," it is not unnecessarily suggestive for the reasons discussed herein.

identified Defendant as the shooter *after* reviewing the audio and video evidence admitted into evidence at the suppression hearing, but *before* he received the text from Detective Bliss containing the photograph of Defendant. Detective Vo's testimony was corroborated by Detective Bliss, who confirmed that Detective Vo already had identified Defendant as the shooter prior to the time he texted Detective Vo the photograph of Defendant. Furthermore, Detective Bliss explained that he texted Defendant's photograph to Detective Vo prior to submitting the affidavit in support of the arrest warrant as confirmation for his own records. In the Court's estimation, the detectives' testimony conclusively establishes that Detective Vo's identification of Defendant was based on his familiarity with Defendant and the evidence gathered during the investigation, and the identification was made prior to receiving the photograph from Detective Bliss, who only sent it for confirmation purposes. Under those circumstances, the Court is convinced that Detective Bliss' text message to Detective Vo containing one photograph of Defendant was not unnecessarily suggestive.

Next, even assuming the identification procedure was unnecessarily suggestive, the totality of the circumstances establishes that Detective Vo's identification of Defendant was reliable considering the *Biggers* factors. *See Biggers*, 409 U.S. at 199-200. As to the first factor, Detective Vo did not witness the shooting firsthand, but he was very familiar with Defendant's appearance from regularly seeing him in person and surveilling him in Hazelwood and therefore was able to identify him on video surveillance captured on cameras in the neighborhood and at Go Go's. Next, as to the second and third factors addressing degree of attention and accuracy of the description, it is notable that Detective Vo is "not a casual or passing observer," but rather a "specially trained … and experienced officer, [who is] expected to pay scrupulous attention to detail" because "his claimed observations [could] be subject later to close scrutiny and examination at any trial."

*Brathwaite*, 432 U.S. at 115. Considering Detective Vo's training and experience, he accurately identified Defendant based on "his stature, his hair style, the clothing that he was wearing earlier in the day, and the car that he was driving." (Docket No. 1813 at 33). The fourth factor, which considers the witness' level of certainty concerning the identification, is satisfied because Defendant's appearance was firmly engrained in Detective Vo's mind from previously observing Defendant pistol-whip an individual outside of Go Go's market. (*Id.* at 50-51). In light of that memorable incident, and the fact that Detective Vo regularly saw Defendant, he was "100 percent" confident in his identification of Defendant even though Defendant's face was obscured in some of the videos. (*Id.* at 41, 42, 50). As for the final factor, the time between the June 13th shooting and Detective Vo's identification of Defendant prior to receiving Detective Bliss' text message and photograph on June 16th was sufficient to be reliable. *See Brathwaite*, 432 U.S. at 116 (finding reliable a photographic identification which took place two days after the crime, as there was not "the passage of weeks or months between the crime and the viewing of the photograph"). All told, the Court finds that Detective Vo's identification of Defendant was reliable.

Finally, the Court is not persuaded by Defendant's argument that "no reasonable person could determine who was in the surveillance video from the shooting or from the Go Go's" because the person's face was obscured, and no facial features could be discerned. (Docket No. 1840, ¶¶ 149, 150). Rather, after months of investigation, Detective Vo was very familiar with Defendant and identified him as the shooter based on his stature, his hair style, the clothing he was wearing, and the car he was driving. *See Brathwaite*, 432 U.S. at 115 (finding identification reliable where description included individual's "race, his height, his build, the color and style of his hair, and … clothing"). To reiterate, Detective Vo testified that he was "100 percent" confident in his identification of Defendant as the shooter. (Docket No. 1813 at 50). Any alleged shortcomings

with Detective Vo's identification of Defendant, including his contention that his facial features were obscured, "go more to the weight of the evidence than the reliability of [his] identification[], and thus [are] issues for the jury." *Brownlee*, 454 F.3d at 140; *see also Scott*, 816 F. App'x at 739 (concluding same).

## III.    CONCLUSION

The Court concludes that Detective Vo's identification of Defendant was neither unnecessarily suggestive nor unreliable and thus it is admissible at trial. Accordingly, Defendant's Motion to Suppress Pre-trial Identification, (Docket No. 1679), is denied.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Date:    April 17, 2026

cc/ecf:  All counsel of record