**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 21-385-1 |
| | ) | |
| JOSHUA YARBOUGH | ) | |

**MEMORANDUM OPINION**

Presently before the Court is Defendant Joshua Yarbough's Motion to Suppress For Illegal Search and Seizure of Vehicle and Motion for *Franks* Hearing (the "Vehicle Suppression Motion"). (Docket No. 1680). After careful consideration of Defendant's Motion, the parties' written submissions, the transcript of the suppression hearing and the credible evidence of record adduced at that proceeding, the Vehicle Suppression Motion will be denied in its entirety for the reasons explained below.

**I.      BACKGROUND**

**A.  Procedural History**

On August 31, 2021, Defendant and 23 others were charged in Count One of the Indictment in this case with conspiracy to possess with intent to distribute and distribute 400 grams or more of fentanyl, 280 grams or more of crack cocaine, a quantity of cocaine, a quantity of heroin, and a quantity of fluorofentanyl, in violation of 21 U.S.C. § 846, for conduct occurring from in and around August 2019 and continuing until in and around August 2021. (Docket No. 3 at 1-2). Defendant also is charged with six counts of possession with intent to distribute and/or distribution of a quantity of fentanyl and/or a quantity of crack cocaine for conduct occurring on or about the following dates: April 26, 2021 (Count Two); April 30, 2021 (Count Three); May 25, 2021 (Count Four); May 30, 2021 (Count Five); and June 18, 2021 (Counts Eight and Nine), each in violation

1

of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  (*Id.* at 3-6, 10-11).  Additionally, Defendant is charged with using, carrying and discharging a firearm during and in relation to a drug trafficking crime, and possession of a firearm in furtherance thereof, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), for conduct occurring on or about June 13, 2021 (Count Six), as well as possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), for conduct occurring on or about June 18, 2021 (Count Seven).  (*Id.* at 7-9).

As background, on May 29 and 30, 2021, there were two shooting incidents involving a white Nissan allegedly driven by Defendant.  (*See* Docket No. 1680-4 at 2).  The Pittsburgh Police obtained a search warrant for the Nissan.  (*See id.*).  The vehicle was searched, and crack cocaine and fentanyl were discovered inside.  (Docket No. 1717 at 30).  This is the basis for Count Five of the Indictment charging Defendant with possession with intent to distribute a quantity of fentanyl and a quantity of crack cocaine on May 30, 2021.  (*Id.*).

Defendant now seeks to suppress all evidence seized from the white Nissan, including any alleged narcotics, two smart phones, cash, live rounds, paperwork, and any statements made by him.  (*See* Docket No. 1680 at 14).  In summary, Defendant asserts that the police did not have reasonable suspicion to detain and question him a second time on May 30, 2021.  (*Id.*, ¶¶ 59-71).  Defendant also argues that the search warrant affidavit for the white Nissan contained false and speculative statements that, when removed, result in an affidavit unsupported by probable cause to search the vehicle.  (*Id.*, ¶¶ 81-96).  Consequently, Defendant maintains that he is entitled to a *Franks* hearing.  (*Id.*, ¶ 97).  The Government responds that Defendant's second detention and the vehicle search both were lawful, thus his Vehicle Suppression Motion should be denied.  (Docket No. 1717 at 34-41).

The Court held a hearing on Defendant's argument that the police did not have reasonable suspicion to detain and question him a second time on May 30, 2021 as set forth in ¶¶ 59-71 of his Vehicle Suppression Motion, the official transcript of which was filed of record.[1] (Docket Nos. 1805, 1813).  At the Court's direction, the parties submitted post-hearing proposed findings of fact and conclusions of law ("FOF/COL").  (Docket Nos. 1840, 1841).  The Government then filed a response to Defendant's FOF/COL, (Docket No. 1850), but Defendant did not similarly respond. All post-hearing submissions are complete, and the matter is ripe for disposition.

### B. **Facts**

As relevant to the disputed issue of whether the second investigative detention of Defendant was lawful, the Government called City of Pittsburgh Police Patrol Officer Alexander Herstine, who testified at the suppression hearing concerning the events bearing on that matter and was subject to cross-examination concerning same.  (*See* Docket No. 1813 at 56-72). The Government also entered into evidence two photographs, one depicting the door of the white vehicle and the other depicting one of its windows.  (*See* Docket No. 1805-1, Govt. Ex. N). Defendant testified on his own behalf, was subject to cross-examination, and also entered into evidence an investigative report authored by Officer Kearns.  (*See* Docket Nos. 1813 at 73-87; 1805-1, Def. Ex. 1).

Before summarizing the testimonial evidence, the Court initially notes that it evaluates the credibility of the witnesses who testified at the hearing consistent with certain well-established principles.  Broadly stated, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States*

---

[1]    A hearing was not necessary on Defendant's argument concerning the search warrant affidavit for the white Nissan and his request for a *Franks* hearing.  *See infra*, §§ II.B, II.D.

*v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).  More specifically, as finder of fact, the Court "is free to accept or reject any or all of a witness's testimony." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted).  To that end, "[c]redibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic." *Id.*  When a defendant testifies, his credibility is to be judged in the same way as any other witness, and a witness' testimony is not to be judged more or less credible because the witness is a law enforcement officer. *Id.* at 569-70 (citations omitted).

In view of these principles, the Court finds that both Officer Herstine and Defendant credibly testified concerning their recollection of the events that unfolded which bear on the matter at issue.  *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) ("[W]hen findings are based on determinations regarding the credibility of witnesses . . . for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.") (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 575 (1985)).  Accordingly, the Court now turns to the testimony adduced at the suppression hearing, which is fairly summarized as follows.

The Court first observes that Officer Herstine presented as an experienced law enforcement officer.  At the time of the hearing, Officer Herstine had been employed for seven years as a patrol officer with the City of Pittsburgh Police in Zone 4, which includes the Hazelwood section of

Pittsburgh.  (Docket No. 1813 at 56-57).  Officer Herstine explained that Hazelwood is a high crime area.  (*Id.* at 61).

As Officer Herstine testified, the Real Time Crime Center ("RTCC") is a monitoring center staffed by police who monitor all cameras and ShotSpotter alerts for the City of Pittsburgh and dispatch information to police over the radio.  (Docket No. 1813 at 57, 58).  On May 29, 2021, Officer Herstine received a ShotSpotter alert for three gunshot rounds at the intersection of Chatsworth and Minden Streets in Hazelwood.  (*Id.* at 58).  The ShotSpotter indicated that the rate of gunfire was high, suggesting that a semi-automatic or automatic firearm was involved.  (*Id.* at 59).  Officer Herstine explained that those firearms eject shell casings, which likely would be located where the shot occurred.  (*Id.*).  In this instance, officers at the RTCC identified the vehicle involved in the ShotSpotter alert as a white Nissan with a black glass roof and a specific license plate number.  (*Id.* at 58).  The vehicle was registered to Defendant's girlfriend.  (*Id.* at 58-59).

Officer Herstine responded to the ShotSpotter alert on May 29, 2021.  (Docket No. 1813 at 60).  He did not find any shell casings at the scene, which suggested to him that they could be inside the white Nissan.  (*Id.* at 60, 72).

The next day, May 30, 2021 at 6:45 p.m., the police received another ShotSpotter alert for 13 rounds in the 400 block of Johnston Street in Hazelwood.  (Docket No. 1813 at 60-61).  Once again, the RTCC identified the same white Nissan from the day before involved in the shooting.  (*Id.* at 61).  Officer Herstine did not respond to the location of the ShotSpotter alert on May 30, 2021, but he learned that officers recovered 7 of the 13 shell casings from the incident.  (*Id.* at 61-62, 72).  Given that all the casing were not recovered, the police believed that there could be evidence in the white Nissan.  (*Id.* at 62).

Because Officer Herstine did not respond to the May 30th ShotSpotter alert, he was unaware that other officers had detained and questioned Defendant about the shooting after a group of people claimed that he was the shooter. (Docket Nos. 1680-4 at 2; 1813 at 62). Defendant stated that he was sleeping at his mother's house during the shooting, and he then was released. (Docket No. 1680-4 at 2).

Later in the evening of May 30th, Officer Herstine was informed that the white Nissan may be located at Rivermont Drive and Johnston Avenue. (Docket No. 1813 at 62). Officer Herstine responded to that location at 7:50 p.m. and found the vehicle parked just a few feet away from the walkway to the entrance of 958 Rivermont Drive. (*Id.* at 62-63). As Officer Herstine approached the vehicle, Defendant exited the residence and walked close to the vehicle. (*Id.* at 63). Officer Herstine, who was unaware that Defendant had been questioned earlier in the day, asked Defendant if the vehicle was his, and Defendant responded that it was his girlfriend's vehicle. (*Id.* at 62, 63, 68). Defendant also mentioned that he was going to take the vehicle to the shop. (*Id.* at 63).

Officer Herstine testified that he then detained Defendant by placing him in handcuffs because he was possibly involved in the shooting. (Docket No. 1813 at 63-64). Officer Herstine elaborated that he detained Defendant because he was the initial reporting officer for the May 29th ShotSpotter alert, which involved the white Nissan, he learned that the same vehicle was involved in another ShotSpotter on May 30th, he had reason to believe Defendant was associated with that vehicle, and he thought that Defendant could be dangerous if he potentially was involved in two shootings. (*Id.* at 64). Officer Herstine also noticed that the driver's side of the vehicle had what appeared to be a bullet hole with tape and spray paint covering it, and the driver's side window was splintered, as depicted in Government Ex. N. (*Id.* at 66-67). Based on those observations, Officer Herstine thought that there may be evidence inside the vehicle. (*Id.* at 67).

6

While Defendant was detained, he mentioned that he was shot at. (Docket No. 1813 at 63, 64). Defendant also mentioned that he operated the white Nissan the prior day on May 29th, but not at the time of the ShotSpotter alert. (*Id.* at 64). Additionally, he said that he was going to pick up his girlfriend at the autobody shop on Irvine Street. (*Id.* at 65). Officer Herstine was unable to reach Defendant's girlfriend, who was the owner of the vehicle, so he and another officer went to the autobody shop to locate her in order to "verify [Defendant's] story, [and get] information on who may have access to that vehicle, given that it was involved in two possible shootings." (*Id.*). The officers did not find Defendant's girlfriend at the autobody shop, so they returned and released Defendant. (*Id.* at 65-66). Defendant was detained for not more than 30 minutes. (*Id.* at 66).

On cross-examination, Officer Herstine acknowledged that Officer Greer was present when Defendant was detained the first time on May 30th and when Officer Herstine detained him later that evening. (Docket No. 1813 at 68-69). Despite Officer Greer's presence on both occasions, Officer Herstine did not know that Defendant had been detained earlier on May 30th. (*Id.* at 62). Nonetheless, even if Officer Herstine had known that Defendant was detained earlier in the day, he still would have detained him a second time because the police had located the white Nissan and identified Defendant as the possible driver of the vehicle involved in two shooting incidents. (*Id.* at 72).

Defendant also testified concerning his two interactions with the police on May 30, 2021. (Docket No. 1813 at 73). During the first interaction, multiple officers approached Defendant outside to the rear of his mother's house. (*Id.* at 73-74). The officers asked Defendant about a shooting that had occurred, and he denied any involvement, stating that he was asleep at his mother's house at the time. (*Id.* at 73-75). The police took Defendant's information and then released him. (*Id.* at 75). Defendant suggested that the police should have seen the white Nissan

7

during the first interaction because the vehicle was parked somewhere behind where he was standing, but he later testified that the vehicle was approximately 30 yards away from him. (*Id.* at 74, 85).

Following the Defendant's first interaction with the police on May 30th, he drove the white Nissan to his cousin's house and was inside the house when he eventually noticed an officer pull up behind the vehicle. (Docket No. 1813 at 75). Defendant exited the residence and spoke to two officers who were present, including Officer Greer who had been present for the first interaction. (*Id.* at 76). During the second interaction, Defendant indicated that the vehicle belonged to his girlfriend, and he declined the officer's request to search it. (*Id.* at 77). After an officer placed Defendant in handcuffs, he stated that the vehicle was shot at the prior day. (*Id.* at 77, 87). Defendant was uncuffed and released after approximately 30 minutes. (*Id.* at 78).

On cross-examination, Defendant admitted that he drove the white Nissan on May 29, 2021, but he asserted that he was not involved in a shooting on that date. (Docket No. 1813 at 79). He later testified that someone shot at the white Nissan on May 29th, and he admitted that there was damage to the vehicle, including a bullet hole on the side of it and a shattered window. (*Id.* at 80, 82). Defendant claimed that he went to the auto repair shop on May 29th, and they put spray paint and tape over the bullet hole. (*Id.* at 80-81, 82). He admitted that he was trying to hide the fact that there was a bullet hole in the vehicle. (*Id.* at 81). Defendant also testified that someone from the auto repair shop was driving the white Nissan when it was shot at on May 29th. (*Id.* at 82-83). Ultimately, Defendant's testimony was that he took the white Nissan to the auto repair shop for spark plugs, left it there, someone from the shop drove it after it was fixed, and it was shot at. (*Id.* at 83). The auto repair shop put tape and spray paint on the bullet hole as a temporary fix until a replacement door which they had ordered arrived at the shop. (*Id.* at 83, 87).

It the Court's estimation, the foregoing fairly summarizes the witnesses' testimony adduced and the evidence admitted at the suppression hearing. With this background, the Court turns to analyze Defendant's suppression claims.

## II.    DISCUSSION

To repeat, Defendant argues that all evidence seized from the white Nissan should be suppressed because the police lacked reasonable suspicion to detain and question him a second time, and because the search warrant affidavit for the white Nissan contained false and speculative statements that, when removed, result in an affidavit unsupported by probable cause to search the vehicle. (Docket No. 1680, ¶¶ 59-71, 81-98). Defendant also maintains that he is entitled to a *Franks* hearing. (*Id.*, ¶ 97).

The Government counters that Officer Herstine had reasonable suspicion to detain Defendant for a second time on May 30, 2021 based on the totality of the circumstances. (Docket Nos. 1841 at 18-19; 1850 at 6). Moreover, the Government submits that the affidavit in question established probable cause for issuance of a warrant to search the white Nissan, and Defendant has not established that he is entitled to a *Franks* hearing. (Docket No. 1717 at 37-40). Nonetheless, even if the affidavit was deficient in any respect, the warrant should be upheld under the good faith exception to the exclusionary rule. (*Id.* at 40-41). The Government is correct that there is no basis to suppress evidence seized from the white Nissan.

### A.    Defendant Was Lawfully Detained a Second Time on May 30, 2021.

Defendant first contends that the second stop on May 30, 2021 was not a lawful investigative detention. (Docket No. 1840, ¶ 112). According to Defendant, the police lacked reasonable suspicion to stop him a second time because nothing changed between their first and second encounter with him. (*Id.*, ¶¶ 113-121). Additionally, Defendant claims that the police did

9

not use the least intrusive means available to detain him because it was unnecessary to place him in handcuffs during the second detention. (*Id.*, ¶¶ 122-128). Even if the police had reasonable suspicion to detain Defendant a second time, he asserts that the stop was extended beyond its permissible scope. (*Id.*, ¶¶ 131-141). Consequently, Defendant argues that the second investigative detention was unconstitutional, and any statements he made and any other evidence seized should be suppressed. (Docket No. 1680 at 9).

Conversely, the Government maintains that the police had reasonable suspicion to detain Defendant and question him a second time under the totality of the circumstances; Defendant's "least intrusive means" argument lacks merit; and the police did not exceed the scope of the stop. (Docket Nos. 1841 at 18-21; 1850 at 6-9). All told, the Government advocates that the second detention of Defendant was not unconstitutional and any evidence resulting therefrom should not be suppressed. (Docket No. 1717 at 36). The Government is correct.

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. CONST. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010). One exception to the warrant requirement is a *Terry* stop. The Supreme Court held in *Terry v. Ohio*, 392 U.S. 1 (1968), that a police officer is permitted, consistent with the Fourth Amendment, to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). For reasonable suspicion to exist, "[t]he officer must simply have some objective justification for the stop and must be able to articulate more than an 'unparticularized suspicion or hunch' that the suspect is engaged in criminal activity." *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014) (quoting *Wardlow*, 528 U.S.

at 124). To determine whether there was an objective basis for reasonable suspicion, we are to consider "the totality of the circumstances - the whole picture." *United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). In analyzing the totality of the circumstances, the court considers whether "a reasonable, trained officer standing in the officer's shoes could articulate specific reasons to justify the seizure." *United States v. Goerig*, 111 F.4th 276, 279 (3d Cir. 2024) (internal quotation marks and citation omitted).

Judged against these legal standards, the Court finds that Officer Herstine had reasonable suspicion to detain Defendant a second time on May 30, 2021, contrary to Defendant's claim that nothing changed that day between the first and second detention. To begin, police had identified the vehicle involved in the shootings on May 29 and May 30, 2021 as a white Nissan with a specific license plate. Officer Herstine had responded to the scene of the May 29th shooting, so he was aware of the vehicle's identification. Although Officer Herstine did not respond to the scene of the May 30th shooting, he was informed later that day that the white Nissan may be located on Rivermont Drive. When Officer Herstine arrived at Rivermont Drive and approached the vehicle, Defendant exited the residence and walked close to the vehicle. In response to Officer Herstine's inquiry whether the vehicle was Defendant's, he stated that it was his girlfriend's vehicle, and he was going to take it to the shop. Thus, Officer Herstine had acquired information, unknown earlier in the day, that Defendant was associated with (and in possession of) the white Nissan. Additionally, Officer Herstine noticed that the driver's side of the vehicle had what appeared to be a bullet hole with tape and spray paint covering it, and the driver's side window was splintered. This, too, was new information. Under the totality of the circumstances, Officer Herstine had reasonable suspicion that Defendant was connected to the white Nissan, which had been involved in two shootings in two days, and therefore justifiably detained him.

Defendant's own testimony controverts his claim that reasonable suspicion for the second detention was lacking because the police should have seen the white Nissan when they first stopped him on May 30th. As Defendant testified, the white Nissan was approximately 30 yards away from him during his first interaction with the police on May 30th, so it is inaccurate to assert that the police necessarily should have seen the vehicle. If the police had seen the white Nissan during their first interaction with Defendant on May 30th, it stands to reason that they would have seized it, which supports Officer Herstine's testimony that the vehicle was located later that evening.

Furthermore, Defendant's contention that Officer Herstine knew or should have known that he was detained earlier on May 30th because Officer Greer was at both incidents is not substantiated by any record evidence, but rather based solely on his own conjecture. Contrary to Defendant's unsupported position, Officer Herstine was a credible witness, and there is no reason to question the veracity of his testimony that he did not know Defendant was detained earlier in the day.[2]

Next, it was not improper for the police to handcuff Defendant during the second detention. A police officer conducting an investigative detention has an "immediate interest ... in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry*, 392 U.S. at 23. Contrary to Defendant's assertion that the police did not use the least intrusive means available to detain him because it was unnecessary to place him in handcuffs during the second detention, the Third Circuit Court of Appeals has held that the use of guns and handcuffs during a *Terry* stop is justified if the officer

---

2    Moreover, as the Government correctly points out, Defendant was questioned during the first detention about the May 30th shooting after a group of people claimed that he was the shooter, not about whether he was associated with, or the driver of, the white Nissan during the May 29th and/or May 30th shootings. (Docket Nos. 1841 at 18; 1850 at 6). Furthermore, as Officer Herstine testified, even if he had known Defendant was detained earlier in the day on May 30th, he still would have detained him a second time because the police had then located the white Nissan and associated him with the vehicle involved in two shootings.

has a reasonable basis for "believing that the individual ... is armed and presently dangerous," such as when an officer suspects that an individual was involved in a shooting. *United States v. Johnson*, 592 F.3d 442, 452-53 (3d Cir. 2010). Here, Officer Herstine testified that he placed Defendant in handcuffs because he was possibly involved in two shootings. (Docket No. 1813 at 64). In this Court's estimation, Officer Herstine took only "such steps as were reasonably necessary to protect [his] personal safety [and that of other officers] and to maintain the status quo during the course of the stop." *Id.* at 453 (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). The Court finds unpersuasive Defendant's argument that the police did not handcuff him during the first detention, thus it was unnecessary to do so during the second one. When the first detention occurred, the police had not yet located the white Nissan, observed the bullet hole in it, and associated Defendant with that vehicle which had been involved in two shootings. By the second detention, Officer Herstine had acquired that information and therefore justifiably placed Defendant in handcuffs.

Finally, Defendant claims that there was no justification to continue the second detention once Officer Herstine confirmed, as Officer Greer previously had determined, that Defendant was not the shooter in the May 30th shooting. (Docket No. 1840, ¶¶ 132, 133). According to Defendant, Officer Herstine's questions about the May 29th shooting, which Defendant asserts "were unrelated to the current investigation," were unjustified and extended the second detention of Defendant beyond its permissible scope. (*Id.*, ¶¶ 131, 135-137). The Court disagrees.

Most notably, nothing in the record substantiates Defendant's assertion that Officer Greer determined he was not the shooter in the May 30th shooting. As the record reflects, when questioned during the first detention, Defendant stated that he was sleeping at his mother's house during the shooting, and he then was released from the scene. (Docket No. 1680-4 at 2). Just

13

because Defendant was released at that time does not conclusively establish that Officer Greer determined he was not the shooter.  Furthermore, when police subsequently discovered the white Nissan with a bullet hole and tied Defendant to the vehicle, Officer Herstine had reasonable suspicion to question him further about the May 30th shooting.[3]

Defendant also incorrectly suggests that Officer Herstine only was investigating the May 30th shooting when he was detained for the second time.  As Officer Herstine testified, police had tied the white Nissan to both the May 29th and May 30th shootings.  (Docket No. 1813 at 58, 61). Officer Herstine further testified that he detained Defendant because he was the initial reporting officer for the ShotSpotter on May 29th, which involved the white Nissan, he learned that the same vehicle was involved in another ShotSpotter on May 30th, he had reason to believe Defendant was associated with the vehicle, and he thought Defendant could be dangerous if he potentially was involved with two shootings.  (*Id.* at 64).  Given that Officer Herstine had reasonable suspicion that Defendant was involved in both shootings and was attempting to ascertain Defendant's role in the incidents, the second detention was "reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 20.    Accordingly, Defendant's second detention was not extended beyond its permissible scope.[4]

---

3        Defendant's assertion that the police should have noticed the bullet hole in the white Nissan during his first detention, (*see* Docket No. 1840, ¶¶ 138-141), does not bolster his contention that the second detention was extended beyond its permissible scope.  As already discussed, Defendant's own testimony that the white Nissan was approximately 30 yards away from him during his first interaction with the police on May 30th undercuts his position that the police necessarily should have seen the vehicle during the first detention.  Officer Herstine's observation during the second detention of a bullet hole in the white Nissan only amplified the reasonable suspicion to question Defendant about both shootings.

4        Defendant does not contest the duration of the second detention, which lasted approximately 30 minutes. (Docket No. 1813 at 66, 78).  Supreme Court precedent "impose[s] no rigid time limitation on *Terry* stops," but stresses "the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."  *United States v. Sharpe*, 470 U.S. 675, 685 (1985).  Therefore, depending on the circumstances of a particular case, courts have found that a 30-minute investigative detention was reasonable.  *See, e.g., United States v. Gunther*, No. 21-2791, 2023 WL 6804573, at *3 (3d Cir. Oct. 16, 2023) (finding "twenty to thirty minutes was a reasonable duration for a stop under the circumstances").  Under the circumstances of this case, the Court finds that the second detention was no longer than reasonably necessary considering Officer Herstine's

14

For all of the reasons discussed, Officer Herstine had reasonable suspicion to detain Defendant on May 30, 2021, thus any evidence that was obtained as a result of Defendant's second detention will not be suppressed.

### B. Detective Vo's Affidavit Established Probable Cause for Issuance of a Warrant to Search the White Nissan.

Detective Vo authored an affidavit in support of a state search warrant for the white Nissan (the "Affidavit").  (*See* Docket No. 1680-4).  Contrary to Defendant's position, the Affidavit established probable cause for issuance of the search warrant for the vehicle.

The legal standard applicable to review of a magistrate judge's determination of probable cause is summarized as follows:

> "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.' " *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).  A trial court exercises "only a deferential review of the initial probable cause determination made by the magistrate." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993) (citing *Gates*, 462 U.S. at 236) (emphasis in original).  "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). The deference given to a magistrate's issuance of a warrant "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions." *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (internal quotations omitted). Still, " 'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' " *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) (internal quotations omitted).
>
> A magistrate's role in issuing a warrant is to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.  A warrant is to be upheld on review "as long as there is a substantial basis for a fair probability that evidence will be found." *Conley*, 4 F.3d at

---

testimony that he attempted to locate Defendant's girlfriend, who was the owner of the white Nissan, at the autobody shop where Defendant supposedly was to have picked her up, to verify Defendant's story and inquire who may have had access to the vehicle.  (Docket No. 1813 at 65).

15

> 1205. **In conducting this assessment, a reviewing court is confined "to the facts that were before the magistrate judge, i.e., the affidavit, and [the court may] not consider information from other portions of the record."** *Jones*, 994 F.2d at 1055. Stated otherwise, the District Court is restricted to viewing only the information confined by the "four corners" of the affidavit before the magistrate. *United States v. Whitner*, 219 F.3d 289, 295-96 (3d Cir. 2000). "The supporting affidavit to a search warrant is to be read in its entirety and in a common sense, nontechnical manner." *Miknevich*, 638 F.3d at 182. This includes "all the circumstances set forth in the affidavit before [her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Gates*, 462 U.S. at 238. Further, " 'probable cause is a fluid concept' that turns on 'the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules.'" *Miknevich*, 638 F.3d at 182 (quoting *United States v. Shields*, 458 F.3d 269, 277 (3d Cir. 2006)). Proof beyond a reasonable doubt is not required. *Id*.

*United States v. Coca*, Crim. No. 14-262, 2016 WL 7013037, at *4 (W.D. Pa. Dec. 1, 2016) (emphasis added).

As an initial matter, no evidentiary hearing is required on this issue. The case law makes clear that this Court's review is confined to the "four corners" of the Affidavit that was before the issuing state magistrate or judge, and we are not to consider information from other portions of the record. *Jones*, 994 F.2d at 1055. Therefore, it would be improper to consider information elicited at a hearing that was not previously submitted to the state court judge in support of the Affidavit.

Turning to the Affidavit, Detective Vo detailed the circumstances surrounding a shooting that occurred on May 29, 2021. (Docket No. 1680-4 at 2). The RTCC issued a ShotSpotter[5] notification for three rounds at the intersection of Chatsworth Avenue and Minden Street and indicated that the possible suspect vehicle had fired at an unknown male victim. (*Id.*). The RTCC described the vehicle as a white Nissan with a black glass roof bearing a specific Pennsylvania license plate. (*Id.*). Surveillance footage in the area showed that the driver of the vehicle fired

---

5    Detective Vo explained that ShotSpotter is an advanced system of sensors, algorithms and artificial intelligence that detects, locates, and alerts police to gunfire, and further detailed the manner in which it operates. (Docket No. 1680-4 at 2).

16

shots across the inside of the vehicle and through the passenger window, and the ShotSpotter indicated that the shots were fired at a rapid rate. (*Id.*). Based on Detective Vo's training and experience, firearms that fire at a rapid rate are most commonly semi-automatic, and the firearm ejects a spent shell casing of the round that is fired. (*Id.*). Given that responding officers did not locate any spent shell casings at the scene, Detective Vo averred that any casings ejected from the firearm were located inside the vehicle. (*Id.*).

Detective Vo also described the circumstances surrounding a shooting that occurred on May 30, 2021. The RTCC issued a ShotSpotter notification for 13 rounds fired in the 400 block of Johnston Avenue. (Docket No. 1680-4 at 2). The RTCC notified responding officers that a black male was seen standing in the street firing at the same white Nissan involved in the shooting on May 29th. (*Id.*). Responding officers only located 7 spent shell casings at the scene. (*Id.*). While at the scene, an officer heard a group of people yelling that the male walking toward them approximately two blocks up the hill was the shooter. (*Id.*). Officers detained the male, later identified as Defendant, and conducted a pat down for weapons with negative results. (*Id.*). Defendant provided his information and stated that he was sleeping at his mother's house during the shooting. (*Id.*). He was then released. (*Id.*).

Detective Vo averred that, approximately 50 minutes later, officers observed a white Nissan with a black roof bearing a specific Pennsylvania license plate parked in front of 958 Rivermont Drive, about a half-mile from the shooting location. (Docket No. 1680-4 at 2). Officer Herstine approached the vehicle and was contacted by Defendant who exited the residence at 958 Rivermont. (*Id.*). Defendant stated that the vehicle belonged to his girlfriend, and he was going to drive it to the shop. (*Id.*). In addition, Defendant stated that he was shot at earlier, but he did

not believe he was the target, and he also stated that he had driven the vehicle the prior day, but only later in the day. (*Id.* at 2-3).

As Detective Vo further averred, police observed that the white Nissan had a bullet hole covered by tape and spray painted, and the paint still was wet. (Docket No. 1680-4 at 3). Police also observed that the driver's window was shattered, but they could not see inside because of the heavy tint. (*Id.*). Detective Vo concluded that, "[b]ecause there was a total of 13 rounds fired and only 7 casings were recovered, [he] believe[d] that the driver of the vehicle returned fire and additional casings and or firearms [were] contained with the vehicle. [He] also believe[d] that because there [was] evidence of the vehicle being struck by bullets, there [was] additional evidence lodged into the vehicle as a result of the unknown shooter." (*Id.*).

Based on Detective Vo's Affidavit, the state court judge issued a search warrant for the white Nissan. Upon review, this Court finds that the information contained in the "four corners" of the Affidavit as detailed herein was sufficient for the state judge to have determined that there was a fair probability that contraband or evidence of the shootings which occurred on May 29 and May 30, 2021 would be found in the white Nissan. *See Gates*, 462 U.S. at 238. To summarize, the Affidavit described that the white Nissan was involved in a shooting on both May 29 and May 30, 2021. Three shots were fired in the first shooting and no shell casings were found at the scene, while 13 shots were fired in the second shooting and only 7 spent shell casings were located at the scene, indicating that shots could have come from inside the vehicle and shell casings could be located therein. When police located the white Nissan, they observed a shattered driver's side window and a bullet hole in the vehicle that was covered by tape and spray paint that still was wet, confirming that the vehicle was involved in a shooting and indicating that evidence of shots fired (and firearms) could be within the vehicle. Additionally, Defendant admitted to being shot at and

18

that he had driven the vehicle at some point on May 29th.  Considering all of this information, the Court finds that the state judge had a substantial basis for concluding that probable cause existed for issuance of the warrant to search the white Nissan.

### C. Even if Probable Cause Was Lacking, the Good Faith Exception Would Apply to the Warrant to Search the White Nissan.

Even if the Court were to conclude that the warrant to search the white Nissan was not supported by probable cause, the good faith exception to the exclusionary rule would apply in this case.  The law applicable to the good faith exception is summarized as follows:

> The Supreme Court has held that evidence derived from a warrant not supported by probable cause is still admissible when obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate judge.  *United States v. Leon*, 468 U.S. 897, 926 (1984).  "[T]he purpose of the exclusionary rule - to deter police misconduct - would not be furthered by suppressing evidence obtained during a search 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.' "  *United States v. Tracey*, 597 F.3d 140, 150 (3d Cir. 2010) (quoting *Leon*, 468 U.S. at 919–20).

> The question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  *Leon*, 468 U.S. at 922.  Indeed, "[t]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception."  *United States v. Hodge*, 246 F.3d 301, 307-308 (3d Cir. 2001) (citing *Leon*, 468 U.S. at 922).  The United States Court of Appeals for the Third Circuit has recognized that the good faith exception does not apply in four limited circumstances:

> > 1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

> > 2)  where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;

> > 3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

> > 4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

19

> *Tracey*, 597 F.3d at 151 (citations omitted).   These limited exceptions "involve conduct that is 'deliberate, reckless, or grossly negligent.' " *Id.* (quoting *Herring v. United States*, 555 U.S. 135 (2009)).

*United States v. Gardenhire*, Crim. No. 15-87, 2017 WL 1105733, at *15 (W.D. Pa. Mar. 24, 2017).

Here, there is nothing in the record to suggest that the state court judge issued the warrant in reliance on a deliberately or recklessly false affidavit, or that he abandoned his judicial role and failed to act in a neutral and detached manner.  Similarly, any claim that the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized is unsupported by the record.  Finally, the warrant Affidavit is not so lacking in indicia of probable cause that it was entirely unreasonable for law enforcement to rely on it in conducting the search. As discussed, under the totality of the circumstances, the information contained in the Affidavit established probable cause for issuance of the warrant to search the white Nissan and, certainly, to support good faith reliance.  *See supra* at 18-19.

In sum, even if the warrant was deemed insufficient, the good faith exception would apply to law enforcement's search of the white Nissan.  *See United States v. Thomas*, 481 F. App'x 765, 768-69 (3d Cir. 2012) (even if warrant to search the defendant's vehicle was not supported by probable cause, officers relied on warrant in good faith, thus suppression of evidence was not warranted). The record in this case simply does not support a finding that one of the four limited circumstances which permit the avoidance of the good faith exception apply here.  *See Tracey*, 597 F.3d at 151.  Consequently, suppression is not warranted.

### D. Defendant Has Not Established That He Is Entitled to a *Franks* Hearing.

Defendant next claims that the following two statements in Detective Vo's Affidavit are contradictory:  "[f]rom surveillance footage in the area, it appears as if the driver of the vehicle

fired shots across the inside of the vehicle and through the passenger side window" and "[t]he vehicle is also heavily tinted and any flash or movement in the vehicle is not able to be seen as a result." (Docket No. 1680, ¶¶ 84-86). Defendant also complains that the Affidavit contains another inconsistency related to the window tint – that Officer Herstine could not see through the tint, but the driver's side window was shattered (meaning that Officer Herstine could have looked into the vehicle). (*Id.*, ¶¶ 90-91). Further, Defendant contends that the Affidavit did not explain how ShotSpotter determines the number of shots fired or whether there is a degree of uncertainty in the technology, nor did the Affidavit identify his previous convictions that precluded him from possessing a firearm. (*Id.*, ¶¶ 92-95). According to Defendant, these contradictions and omissions justify a *Franks* hearing. He is incorrect.

In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the Supreme Court articulated the rule governing situations involving allegedly misleading search warrant affidavits, holding that a defendant has the right to an evidentiary hearing to challenge the truthfulness of statements made in an affidavit establishing probable cause if certain requirements are met. To obtain a hearing, *Franks* requires a defendant to make a substantial preliminary showing that the affidavit contained a false statement, which was made knowingly and intentionally or with reckless disregard for the truth, and which is necessary to the finding of probable cause. *Id.* at 155–56, 171. In order to make this showing, the defendant cannot rest on conclusory allegations or a "mere desire to cross-examine." *Id.* at 171. Rather, he must specifically identify the alleged false statements or omissions in the affidavit[6] and present an offer of proof contradicting the affidavit, including

---

[6]    Statements or assertions contained in an affidavit of probable cause are "made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.' " *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (quoting *United States v. Clapp*, 46 F.3d 795, 801 n. 6 (8th Cir. 1995)). Omissions from an affidavit are made with reckless disregard for the truth if an affiant withholds facts that any reasonable person would know that a judge would want to know. *Id.* at 788. A district court "may properly infer that an affiant acted with reckless disregard for the truth where his affidavit contains an averment that was without sufficient basis at the time he drafted it." *United*

materials such as affidavits or sworn or otherwise reliable statements of witnesses, or provide a satisfactory explanation of their absence. *Id.*; *see also United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022) (citing *United States v. Yusuf*, 461 F.3d 374, 383 n. 8 (3d Cir. 2006)).

"[The] preliminary showing [that a defendant must make] is no light burden and puts the defendant to task by requiring some offer of proof that materially false statements were recklessly or intentionally made." *United States v. Romeu*, 433 F. Supp. 3d 631, 645 (M.D. Pa. 2020) (quoting *United States v. Darby*, No. 1:14-CR-00123, 2015 WL 13344905, at *3 (M.D. Pa. Aug. 19, 2015)). To reiterate, "[t]o make the initial showing, a defendant must allege with specificity what was false in the affidavit, must provide proof, must allege that the affiant had a culpable state of mind, and must allege that the remaining information from the affidavit is insufficient to support a finding of probable cause." *United States v. Yokshan*, 431 F. App'x 170, 173 (3d Cir. 2011) (citing *Franks*, 438 U.S. at 171-72).

If the requirements of the substantial preliminary showing "are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-72. However, if the remaining content is insufficient, the defendant is entitled to a hearing.[7] *Id.* at 172.

---

*States v. Brown*, 631 F.3d 638, 649 (3d Cir. 2011). However, when attempting to demonstrate that the affiant included a false statement in a warrant affidavit or omitted material from it, it is insufficient to prove that he acted with negligence or made an innocent mistake. *Franks*, 438 U.S. at 171; *Yusuf*, 461 F.3d at 383.

7       If a *Franks* hearing is held, and the defendant proves by a preponderance of the evidence that the false statements or omissions were made knowingly and intentionally or with a reckless disregard for the truth, and with the affidavit's false material set aside, the remaining content is insufficient to establish probable cause, then the warrant must be voided, and the fruits of the search must be excluded from the trial. *Franks*, 438 U.S. at 156; *see also United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993).

In light of these legal standards, Defendant is not entitled to a *Franks* hearing because he has not made the threshold substantial preliminary showing for two reasons: he did not make an offer of proof establishing that Detective Vo misstated or omitted information from the Affidavit knowingly and intentionally or with reckless disregard for the truth; and (2) even if the information that Defendant claims is a contradiction or omission is excised or inserted, the Affidavit still would contain sufficient content to support a finding of probable cause.

As noted above, Defendant has identified certain alleged contradictions in the Affidavit and has specified other items that he contends were omitted.  Crucially, however, he did not make an offer of proof consisting of affidavits or sworn or otherwise reliable statements of witnesses to contradict the Affidavit, nor has he explained the absence of these materials.  *See Franks*, 438 U.S. at 171; *Desu*, 23 F.4th at 234; *Yusuf*, 461 F.3d at 383, n. 8; *United States v. Rodriguez-Colon*, 827 F. App'x 188, 190 (3d Cir. 2020) (affirming denial of motion to suppress evidence claiming that affidavit in support of search warrant contained material omissions where the defendant's challenge did not contain an offer of proof).  Despite the absence of an offer of proof, the Court will address the alleged contradictions and omissions in turn.

First, contrary to Defendant's assertion, Detective Vo's statements that surveillance footage appeared to show that the driver of the vehicle fired shots from inside of the vehicle and through the passenger side window and that any flash or movement in the vehicle was unable to be seen because of heavy window tint are not contradictory.  As the Government observed, the surveillance video could have shown bullets or movement outside of the vehicle that would have led Detective Vo to conclude that the driver fired from inside and through the passenger window. (Docket No. 1717 at 39).  Likewise, Defendant is incorrect that it was inconsistent to state that Officer Herstine could not see through the tint, but the driver's side window was shattered.  The

23

Government correctly pointed out that a window can be shattered but not fully broken and still maintain its tint. (*Id.*).

Next, as to alleged omissions, Defendant incorrectly claims that Detective Vo's Affidavit did not explain how ShotSpotter determines the number of shots fired. Detective Vo explained that "ShotSpotter is an advanced system of sensors, algorithms and artificial intelligence to detect, locate and alert police to gunfire. If at least three sensors detect a pulse that is believed to be a gunshot, the sensor then sends a small data packet to cloud servers where multi-lateration is used based on time difference of arrival and angle of arrival of the sound to determine a precise location." (Docket No. 1680-4 at 2). Nonetheless, Defendant also complains that Detective Vo did not specify whether there is a degree of uncertainty in the ShotSpotter technology. (Docket No. 1680, ¶ 92). Contrary to Defendant's suggestion that more information was necessary in that regard, law enforcement officers are not required to include every detail in an affidavit of probable cause. *See United States v. Ventresca,* 380 U.S. 102, 108 (1965) (Warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity . . . have no proper place in this area.").

Finally, Defendant claims that while Detective Vo averred that he sought to search the vehicle for a Pennsylvania violation of a person not to possess a firearm, he only alleged that Defendant was prohibited from possessing a firearm based on previous criminal convictions but omitted listing those convictions in the Affidavit. (Docket No. 1680-4, ¶¶ 93-95). To reiterate, law enforcement officers are not required to include every detail in an affidavit of probable cause, *see Ventresca*, 380 U.S. at 108, but if Defendant's specific prior convictions had been included, it would not have defeated the finding of probable cause. *See United States v. Gordon*, 664 F. App'x 242, 246 (3d Cir. 2016) (*Franks* hearing not warranted "if a court were to reconstruct the affidavit

24

[to include the omitted information and] the evidence in support of probable cause would only be more reliable").

In summary, Defendant fails the first prong of *Franks* because he has not presented an offer of proof contradicting the Affidavit and showing that Detective Vo knowingly and intentionally made false statements or omitted information from the Affidavit or that he acted with reckless disregard for the truth. *See United States v. Rivera*, 524 F. App'x 821, 826 (3d Cir. 2013) ("Even if the information provided by the informants was unreliable, [defendant] has offered no evidence that the detective who provided the affidavit either knew that the information was not true or recklessly disregarded its falsity."). At most, Defendant has made conclusory allegations with respect to the challenged contradictory statements and omissions which are insufficient to meet his burden for a hearing under *Franks*. *See Desu*, 23 F.4th at 234 (explaining that a defendant cannot "rest on mere conclusory allegations . . . but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses") (quoting *Yusuf*, 461 F.3d at 383, n.8).

Furthermore, even if the alleged contradictory information and omissions identified by Defendant are excised or inserted, the Affidavit still would contain sufficient content to support a finding of probable cause as discussed above. *See United States v. McKnight*, 568 F. App'x 178, 182 (3d Cir. 2014) ("In a *Franks* proceeding, the court assesses materiality by removing allegedly false statements, inserting omissions, and determining whether probable cause nonetheless remains.") (citing *Yusuf*, 461 F.3d at 383-84). Accordingly, Defendant is not entitled to a *Franks* hearing regarding the validity of the warrant to search the white Nissan.

## III.    CONCLUSION

For all of the reasons articulated above, Defendant's Motion to Suppress For Illegal Search and Seizure of Vehicle and Motion for *Franks* Hearing, (Docket No. 1680), is denied in its entirety.

An appropriate Order follows.

<u>s/ W. Scott Hardy</u>
W. Scott Hardy
United States District Judge

Date:    June 1, 2026

cc/ecf:  All counsel of record